**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1200
_____

UNITED STATES OF AMERICA

v.

DONTE JACOBS,

Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
(District Court No. 1:19-cr-00094-001)
District Judge: Honorable Richard G. Andrews

_____

Argued on March 11, 2021

Before: SMITH*, Chief Judge, McKEE, AMBRO, Circuit
Judges

(Opinion filed: December 16, 2021)

_____

* Judge Smith was Chief Judge at the time this appeal was
argued. Judge Smith completed his term as Chief Judge and
assumed senior status on December 4, 2021.

Whitney C. Cloud  **[Argued]**
Jesse S. Wenger
Christopher de Barrena-Sarobe
Office of United States Attorney
1313 North Market Street
Hercules Building, Suite 400
Wilmington, DE 19801

Attorneys for Appellee

Peter Goldberger  **[Argued]**
50 Rittenhouse Place
Ardmore, PA 19003

Attorneys for Appellant

_____

OPINION

_____


AMBRO, <u>Circuit Judge</u>.

Jurors have a marked edge when weighing trial evidence.  They view it firsthand and can assess the credibility of the witness testimony based on their own observations.  Appeals courts, on the other hand, are limited to reviewing a cold record, sometimes years after the trial took place.  So when challenges to the sufficiency of the evidence come to us on appeal, we are careful not to usurp the jury's role by acting as independent factfinders.  Instead, we review its verdict for "bare rationality," asking only whether any reasonable juror could find the defendant guilty beyond a reasonable doubt.

Donte Jacobs asks us to hold the jury's guilty verdicts against him—for distributing and conspiring to distribute the fentanyl and heroin that caused Therisa Ally's overdose death—fell below that threshold level of rationality. Now on appeal, he tries to establish reasonable doubt by pointing to gaps in the Government's evidence and offering alternative explanations for Ally's death.

We are unconvinced. Though the Government did not prove Jacobs' crimes with 100% certainty, it was not required to do so. A rational juror could have decided Jacobs was guilty beyond a reasonable doubt after drawing inferences from the evidence and testimony presented at trial. We will not second-guess that decision.

The District Court also did not err in its jury instructions or in denying the defense's challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). It did, though, incorrectly impose a "general sentence" for Jacobs' three convictions rather than impose an individual sentence for each offense. We thus vacate his sentence and remand to the District Court to clarify a specific sentence for each offense.

## I.     FACTUAL AND PROCEDURAL HISTORY

The last thing Jeffrey Kane remembers before falling asleep in the early hours of June 29, 2016, was his girlfriend, Therisa Ally, sitting cross-legged on the floor by their bed. He heard wax bags being shaken and saw her arms moving like they did when she was preparing her heroin. They had fought earlier that night about her heroin addiction and weren't speaking to each other. He got up from the bed, took an Ambien, and fell asleep.

3

When he awoke the next morning, Ally was still sitting cross-legged on the floor next to their bed. She was slumped over. He felt her, and then shook her a bit, but she was stiff and cold to the touch. He quickly called 911 and tried to lay her down to perform CPR, but he couldn't maneuver her body into the correct position. When the emergency workers arrived, they found Ally lying on her side at the foot of her bed with a tourniquet wrapped around her right arm. There was no pulse.

After they determined Ally could not be resuscitated, police officers cleared the room and began collecting evidence. Sticking out from the bed, just above Ally's knees, the officers spotted a purple clutch purse. In it they found four bundles of what appeared to be heroin, divided into smaller wax bags bearing an ink stamp butterfly image and the word "Butter." One of the wax packages was later tested at a lab and found to contain a mixture of heroin and fentanyl.

On the floor of the bedroom, the officers found another purse. This red-patterned shoulder bag, described by one officer as "basically a to-go bag for drug users," contained a "bunch of syringes" and nine empty wax packets that were stamped with a skull wearing a Viking helmet. Appx. at 476. No other "Viking bags" were found in the room.[1]

The police also discovered a small round coin purse in the bedroom, holding nine full bags of drugs packaged in wax packets bearing a stamp of a bulldog wearing a top hat. The lab tested just one of these bags and determined it contained

---

[1] One of the investigating officers testified at trial that the police did not request lab testing for the residue in the Viking bags because there was "nothing in them." Appx. at 497.

4

only heroin. There were no empty "Bulldog bags" in the bedroom.

Other drug paraphernalia lay strewn about the room. Two empty Butter bags were torn open on the floor; another 54 empty Butter bags were in the trash can. Near Ally's feet was a used syringe, blue bottle top, and a packet of cigarettes, with one cigarette pulled out and the filter partially removed.[2] A syringe loaded with a brown substance sat on a shelf in the bedroom.

The day after Ally's death, Kane agreed to cooperate with agents and to conduct a controlled purchase of drugs from Jonathan Collins. Collins had been Ally's dealer for about two and a half years, and she had bought five bundles of heroin from him nearly every day.[3] In fact, Ally had bought heroin from him—the Butter brand—the evening of her death. At the meeting, Collins handed Kane five bundles of Butter-stamped heroin. Kane asked Collins if it was "that same stuff" from the night Ally overdosed, and Collins (not knowing Ally had passed away) confirmed it was. Appx. at 549, 694. With that, the officers stepped in, seized the heroin bundle, and arrested Collins. A Drug Enforcement Agency laboratory tested samples from those Butter bags and determined that, like the Butter bag tested from Ally's room, they contained fentanyl and heroin. Yet unlike the samples taken from the bedroom,

_____

[2] Detective Cowdright explained that an addict prepares an injection of heroin by mixing water and heroin powder in a bottle top, soaking up the liquid with a cigarette filter, and loading a syringe through the filter so that any chunks are removed.

[3] Collins estimated that Ally had not bought heroin from him 10 to 20 days in the two and a half years he had been her dealer.

the lab performed a quantitative analysis on these drugs and concluded that fentanyl was "the most substantial portion of the substance within that mixture."[4]  *Id.* at 587.

Collins agreed to cooperate with the police and explained that he had obtained the Butter-stamped heroin from Donte Jacobs.  The latter had approached Collins about dealing his heroin at the end of February or beginning of March 2016.  By mid-March, Jacobs became Collins' only heroin supplier after Collins received positive "customer feedback" on Jacobs' heroin.  Under their arrangement, Jacobs gave pre-packaged bags to Collins, who then sold them to users like Ally.  According to Collins, Jacobs knew that he was selling heroin in Delaware, and Collins even gave him "customer feedback" from time to time.

Jacobs was eventually arrested for distributing the drugs that killed Ally, and he opted to go to trial.  During jury selection, the Government used its peremptory strikes to strike all but one minority juror.  Jacobs, an African-American, raised a *Batson* challenge, asserting that the Government was striking jurors for racially discriminatory reasons.  When questioned by the District Court, the prosecutor explained that he struck Juror 9, also African-American, because he "was asleep during most of the Court's initial questioning" and had pink and bleached hair, which "goes with sort of a counter culture." *Id.* at 369.  And Juror 26, who is Latino, was struck also, as "he had issues with the criminal justice system because of statistics and

---

[4] Drug dealers mix heroin with substances such as fentanyl to "make more product."  Appx. at 776.  When they do, it is "not an exact science."  *Id.* at 778.  So "[s]ome bags may not contain any fentanyl, [and] some may contain a . . . higher concentration of fentanyl."  *Id.*

studies that he read." *Id*. at 372. The prosecutor worried that Juror 26 "may implicitly hold the government to a higher burden, particularly with defendants that are minority defendants." *Id*. He also mentioned that Juror 26 seemed "involved in statistics" and might try to apply the beyond-a-reasonable-doubt standard to a mathematical certainty. *Id*. at 373.[5] After explaining that he believed the prosecutor's reasons, the District Court Judge rejected the *Batson* challenge and proceeded to trial.

At trial, Kane, Collins, and the various police officers involved in the investigation testified. A forensic pathologist, Dr. Daniel Brown, also testified and explained that, based on his autopsy of Ally, she died of a drug overdose—specifically, "acute multiple drug intoxication." *Id*. at 788, 800. A forensic toxicologist, he said, would have to "determine which drugs caused the most damage." *Id*. at 800. The forensic toxicologist, Dr. Michael Coyer, then testified that most drugs in Ally's system were at or on "the low side" of therapeutic levels. *Id*. at 823. But the fentanyl dosage in her blood stream was "ten times higher than what would be the reported therapeutic range." *Id*. at 824. It was, in fact, a "lethal level of fentanyl." *Id*. "[B]ut for the use of that substance that contained fentanyl," Coyer explained, Ally "would not have died." *Id*. at 826.

Coyer also noted that the postmortem performed on Ally established that her blood was "consistent with someone who died from a substance contained in the Butter bag" the lab had tested. *Id*. at 825. He recognized, though, that this conclusion rested on the lab's determination that the Butter

---

[5] The Government also used its peremptory strikes on other minority jurors, but Jacobs does not challenge those on appeal.

7

bag—like Ally's blood sample—contained heroin *and* fentanyl. He did not know the concentrations of heroin or fentanyl in the tested bag because the lab only performed a qualitative analysis. His analysis also did not address the possibility that the Viking or Bulldog bags caused Ally's death, as no Viking bags were tested and the sample Bulldog bag only contained heroin.

The jury ultimately convicted Jacobs of two counts: (1) conspiracy to distribute and/or possess with the intent to distribute fentanyl and heroin resulting in death (Count 1); and (2) distribution of fentanyl and heroin resulting in death (Count 2).[6] The District Court sentenced Jacobs to 288 months' imprisonment and five years of supervised release, but it did not specify a sentence on each count. This appeal followed.[7]

## II.    ANALYSIS

Jacobs' conspiracy and distribution offenses contain a two-part penalty structure. If he were found guilty just of distributing or conspiring to distribute heroin and fentanyl, he could be sentenced to no more than 20 years in prison. 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846. But Congress enhanced the penalty for distribution where "death or serious bodily injury results from the use of such substance": a 20-year mandatory minimum, with a maximum life sentence. *Id.* § 841(b)(1)(C). Because the jury found Jacobs guilty on all charges *and* that Ally's death "resulted from the use of

_____

[6] Jacobs did plead guilty to one count of being a felon in possession of a firearm. 18 U.S.C. §§ 922(g)(1), 924(a)(2).

[7] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. Appellate jurisdiction rests on 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1).

8

fentanyl" he distributed and conspired to distribute, he faced a mandatory minimum of 20 years in prison.

Jacobs now raises four arguments on appeal. First, the evidence could not support the death-resulting convictions beyond a reasonable doubt. Second, the jury instruction explaining § 841(b)'s "results in" language should have charged the jury to find proximate, not just actual, cause. Third, the Government's peremptory strikes of Jurors 9 and 26 violated *Batson*'s bar on the discriminatory exclusion of minority jurors. And finally, the Court's imposition of a "general sentence" on the three counts, rather than an individual sentence on each count, requires resentencing. We address each argument in turn.

### A. Sufficiency of the Evidence

We begin with Jacobs' assertion that the Government presented insufficient evidence to show his distribution activities resulted in Ally's death. Jacobs contends there were alternative explanations for Ally's overdose and the Government did not prove beyond a reasonable doubt the fentanyl that killed Ally came from the Butter bags he sold. After all, he says, no one saw which bag Ally used when she overdosed. And the Government only tested samples from one Butter bag and one Bulldog bag, and never even sent the Viking bags to the lab. No evidence ever tied Jacobs to the Bulldog and Viking bags; so, if Ally overdosed using one of those, her death could not be traced back to him.

We are unconvinced. Jurors, not judges, are the factfinders in criminal cases, and part of a juror's role is to draw reasonable inferences from the evidence presented at trial. *See Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Our review of the sufficiency of the evidence is thus highly

9

deferential to the jury's verdict. We look at the record in the light most favorable to the prosecution and ask only whether *any* "reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–31 (3d Cir. 2013) (en banc) (quoting *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987)). And we uphold the verdict as long as it does not "fall below the threshold of bare rationality." *Id.* at 431 (quoting *Coleman*, 566 U.S. at 656).

What's more, because Jacobs failed to challenge the sufficiency of the evidence before the District Court, we review only for plain error. He must now show that (1) there was an error, (2) it was plain (*i.e.*, clear under current law), and (3) it affected his substantial rights. *United States v. Fattah*, 914 F.3d 112, 172 (3d Cir. 2019). Even then, we will only address the error if we conclude that (4) it "seriously affected the fairness, integrity, or public reputation of the judicial proceeding." *Id.*

It is not settled how much more deferential plain-error review of the sufficiency of the evidence can be, but, even under our normal review, this jury's verdict would pass scrutiny. The Government's evidence sufficiently established the following. Jacobs supplied the Butter bags that Ally bought the night of her death and were later found near her body. Appx. at 549–50 (Kane's testimony that the heroin Collins gave him in a controlled purchase was the "same thing that [Ally] had gotten"); *id.* at 615 (Collins' testimony that Jacobs was his only supplier before Ally's death); *id.* at 627 (Collins' testimony that he had given Ally Butter-stamped heroin on June 28, 2016, and had given Kane the same Butter-stamped heroin on June 30, 2016). Second, testing revealed that one of

the Butter bags near Ally's body, and several of the Butter bags later bought in a controlled purchase from Collins, contained fentanyl. Third, Ally would not have died had she not injected fentanyl.

Finally, there was enough evidence for a jury to conclude that the Butter bags, and not the Viking and Bulldog bags, were the source of the lethal drugs Ally ingested before her death. The Bulldog bags were full, no empty Bulldog bags were found in the bedroom, and one of the full bags selected for testing contained only heroin and no fentanyl. Appx. at 482, 485–86. The empty Viking bags were in a closed shoulder bag—to repeat, often a "to-go bag for drug users"—which supports the inference that Ally ingested the substance of those bags well before her death. *Id.* at 476. Further, dozens of empty Butter bags were found in the trash can and on the floor near Ally's body, but the Bulldog and Viking bags were found only inside a coin purse and shoulder bag, respectively. To credit Jacobs' suggestion that the lethal fentanyl came from the Viking or Bulldog bags, the jury would have to believe Ally placed them inside a bag or purse before overdosing despite evidence that she died suddenly with a tourniquet still on her arm. The jury rejected Jacobs' explanation, which was discussed during defense counsel's cross-examination and closing arguments.

Together, this evidence is enough for a rational juror to conclude beyond a reasonable doubt that the Butter bags supplied by Jacobs were the source of the lethal fentanyl Ally ingested. Quantitative testing of a greater number of the bags found at the scene no doubt was preferable, but we will not disturb the jury's decision when the other evidence is more than enough to meet the low bar for affirming Jacobs' convictions. Indeed, "[r]eversing the jury's conclusion simply

because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." *Caraballo-Rodriguez*, 726 F.3d at 432.

## B. The Jury Instruction

Jacobs also insists that even if there were sufficient evidence to support his convictions, the District Court erred by failing to instruct the jury that "proximate cause," on top of "but-for cause," is required to prove that "death resulted" from drug distribution under § 841(b). In other words, the District Court told the jury guilt exists no matter how far down the chain of causation Jacobs became involved (in legalese, actual cause or but-for causation), but it should have instructed that they could find him guilty only if Ally's death was a "foreseeable result" of his heroin distribution (that is, proximate cause).[8]  Though we normally exercise plenary

---

[8] But-for causation means that a result can be traced back to a triggering action—no matter how far down the chain of causation you have to go.  So if Jacobs sold fentanyl to Collins and Collins sold fentanyl to Ally and Ally overdosed on fentanyl, all that matters is that if Jacobs hadn't sold Collins the fentanyl, Ally wouldn't have overdosed.

In contrast, proximate causation cuts the causal chain at foreseeability.  Let's say Jacobs sold a non-lethal amount of fentanyl to Collins, who sold to a user who combined it with other fentanyl (making the dosage fatal) and then overdosed.  If we applied proximate causation, then even though the user would not have died without Jacobs selling the non-lethal dose of fentanyl, Jacobs would not be responsible unless he could have foreseen how the user would combine fentanyl doses.

12

review to determine whether a jury instruction misstated the law, *see United States v. Piekarsky*, 687 F.3d 134, 142 (3d Cir. 2012), Jacobs admits that this argument is subject only to plain-error review because he failed to raise it at trial. Our precedent forecloses Jacobs' proximate cause argument, so he has not shown error, much less plain error.

Jacobs would face a 20-year mandatory minimum if Ally's death "result[ed] from the use" of the fentanyl that he distributed. *See* 21 U.S.C. § 841(b)(1)(C). Though the statute does not define whether "results from" means proximate or actual causation, our Court answered this question in *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999). The plain language of § 841(b)(1)(C) "neither requires nor indicates that a district court must find that death resulting from the use of a drug distributed by a defendant was a reasonably foreseeable event." *Id.* at 830 (citing *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994)). Instead, the provision puts drug dealers on "clear notice that their sentences will be enhanced if people die from using the drugs they distribute." *Id.* (quoting *Patterson*, 38 F.3d at 145). Because Congress recognized that "risk is inherent in the [drug] product," it intended to enhance a defendant's sentence whenever death resulted from the distribution of certain drugs, regardless of whether that defendant could have reasonably foreseen that death would result. *Id.* at 831.

Jacobs maintains that the Supreme Court effectively overruled *Robinson* in *Burrage v. United States*, 571 U.S. 204 (2014), and *Paroline v. United States*, 572 U.S. 434 (2014). But we do not read those cases so broadly. In *Burrage*—another case involving the "death results" element of § 841—the trial court refused to give either a but-for cause instruction or a proximate cause instruction. When reviewing that

13

decision, the Supreme Court observed that "a defendant *generally* may not be convicted unless his conduct is both (1) the actual cause, and (2) the 'legal' cause (often called the 'proximate cause') of the result." *Burrage*, 571 U.S. at 210 (emphasis added) (internal quotation marks omitted). The Court, though, never reached whether § 841 contains a proximate cause requirement because it reversed the defendant's conviction based on the trial court's failure to give a but-for cause instruction. *Id.* at 210, 219.

Jacobs' appeal to *Paroline* fares no better. There the Supreme Court considered a child pornography statute that, unlike § 841, included an express proximate cause requirement. *Paroline*, 572 U.S. at 446. Although *Paroline* generally observed that the "concept of proximate causation is applicable in both criminal and tort law," *id.* at 444, it did not import a proximate cause requirement into § 841 or discuss that statute at all.

Neither *Burrage*'s nor *Paroline*'s general pronouncements about proximate cause in criminal statutes are enough to overrule our precedent. So we continue to follow *Robinson* until reconsidered by our Court *en banc* or undermined by the Supreme Court. *See Karns v. Shanahan*, 879 F.3d 504, 514 (3d Cir. 2018); 3d Cir. I.O.P. 9.1.

Further, even if *Burrage*, *Paroline*, or any of the other cases cited by Jacobs did chip away at our reasoning in *Robinson*, it was not "plain error" for the District Court to rely on it. An error is plain only if it was "clear under current law." *Fattah*, 914 F.3d at 172. As we have never explicitly overruled our current law—*Robinson*—it can hardly be clear the District Court should not have followed it. It thus did not plainly err in offering only a but-for causation jury instruction.

14

## C.    The *Batson* Challenge

Next, Jacobs argues that the District Court erred before his trial even began when it allowed the Government to use its peremptory strikes to remove all but one minority venire member from the jury.  Though the Government may generally use its peremptory challenges however it likes, the Fourteenth Amendment's Equal Protection Clause prohibits striking jurors based on their race.  *Batson*, 476 U.S. at 89.  Jacobs insists on appeal that the Government did so when it struck two minority jurors from his panel: Juror 9 and Juror 26, his focus being more on the latter.

A trial court determines whether a peremptory strike violates equal protection using the burden-shifting framework established in *Batson.*  First, the defendant must make out a *prima facie* case of discriminatory intent.  *Id.* at 93–94.  If that occurs, the Government, as a second step, must provide a race-neutral explanation for exercising its peremptory strike.  *Id.* at 94.  At that step, the explanation need not be "persuasive, or even plausible." *United States v. Savage*, 970 F.3d 217, 266 (3d Cir. 2020) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).  Instead, at the third step, the court evaluates the persuasiveness of the prosecutor's proffered reasons to decide whether the Government was "motivated in substantial part by discriminatory intent."  *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)).

Our appellate review of a *Batson* challenge is highly deferential to the trial court.  Though we will take a fresh look to ensure that the district court did not deviate from the *Batson* analytical framework, *United States v. Milan*, 304 F.3d 273, 283 (3d Cir. 2002), deciding whether there was discriminatory intent "represents a finding of fact of the sort accorded great

deference on appeal," *Savage*, 970 F.3d at 267 (quoting *Hernandez v. New York*, 500 U.S. 352, 364 (1991)). This is because finding discriminatory intent "largely will turn on [an] evaluation of credibility." *Flowers*, 139 S. Ct. at 2244 (quoting *Batson*, 476 U.S. at 98 n.21).

Though the parties agree that the defense made out a *prima facie* case of discrimination, satisfying *Batson*'s first step, Jacobs insists that there were errors at both steps two and three of the *Batson* analysis. First, he argues that the Government's reasons for striking Juror 26 were not race-neutral. The prosecutor, in part, struck that juror due to his "issues with the criminal justice system because of statistics and studies that he read." Appx. at 372. Jacobs claims that because Juror 26 based his views in part on his own experiences as a Latino person, this was not a race-neutral reason for the strike.

We disagree. The Ninth Circuit has explained that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*." *Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999); *see id.* ("*Batson* does not forbid striking a juror who holds a particular opinion about the U.S. justice system. Rather, it forbids striking jurors based on their race." (quoting *United States v. Fike,* 82 F.3d 1315, 1320 (5th Cir. 1996))). As in that case, Jacobs did not try to make any showing before the District Court that "concern regarding the potential of racist attitudes of juries is 'a characteristic that is peculiar to any race,'" *id.* (quoting *Purkett*, 514 U.S. at 769), so striking him on that basis was not the equivalent of striking him because of his race. Moreover, the Government offered another race-neutral reason for removing Juror 26 that satisfied step two: he was a

"numbers guy" who might inadvertently hold the Government to too high a burden.

Second, Jacobs claims that the District Court failed to conduct a proper analysis at "step three" of *Batson*. He contends that it mistakenly believed it was bound to accept the Government's reasons for its strikes if they were facially neutral. But that diverges from the record. After the Government provided its reasons, the Court allowed the defense to respond. It then properly conducted a step-three analysis and reached its own conclusion—based on the evidence and its own evaluation of the prosecutor's credibility—that the Government lacked discriminatory intent. The Court "accept[ed] that Number 9 ha[d] been, at a minimum, do[z]ing on and off"—which we take to mean that it determined the prosecutor's account was credible, not that it was deferring to whatever the prosecutor said. Appx. at 379. This is reinforced by its affirmation that the Government's reason for striking Juror 26 "make[s] sense" because the Court "believe[d] [the prosecutor] when he sa[id] why he did these various things." *Id.* at 378–79. The District Judge reiterated this in his memorandum denying Jacobs' post-trial motions, saying, "I credited the prosecution's race-neutral explanations" and "evaluated the justifications." *Id.* at 13.

The District Court thus properly engaged in a thorough dialogue with counsel and scrutinized the evidence before determining that the Government's race-neutral reasons were not pretextual. The Judge adequately explained why he believed the Government's reasons were valid and, after giving the defense ample time to respond, told why he was not persuaded by the defense's arguments. Jacobs has identified nothing clearly erroneous about those conclusions. Thus they stand.

17

## D. The General Sentence

Finally, Jacobs requests a full resentencing because the District Court imposed a "general sentence" without explaining which parts of the sentence were attributable to the three counts of conviction. Under the Sentencing Guidelines, the District Court must impose a sentence for each count. *See United States v. Ward*, 626 F.3d 179, 184 (3d Cir. 2010) (citing U.S.S.G. § 5G1.2(b), (c)). The Government concedes that did not occur here but argues we should merely remand for clarification rather than full resentencing. We agree.

In *Ward*, when we determined that the Guidelines did not allow for general sentences, we simply said that we would "remand for resentencing." *Id.* at 184–86. We didn't explain whether that involved a full resentencing process or just clarification of the sentence. But we cited, *id.* at 185, a case from the Eleventh Circuit that "remand[ed] . . . for clarification of the sentence," *United States v. Moriarty*, 429 F.3d 1012, 1025 (11th Cir. 2005), and one from the D.C. Circuit instructing the district court to "specify sentences for the individual counts" while it fixed other errors in sentencing, *United States v. Hall*, 610 F.3d 727, 745 (D.C. Cir. 2010). A few years after *Ward*, in *United States v. Andrews*, we were more direct about what we meant by "resentencing" when we vacated the defendant's general sentence: "[W]e will vacate . . . and remand for the limited purpose of allowing the District Court to clarify the sentence imposed on each count of conviction." 681 F.3d 509, 532 (3d Cir. 2012). We thus follow suit by vacating and remanding Jacobs' sentence for clarification.

\* \* \*

18

A jury found Therisa Ally died because Jacobs cut the heroin he distributed to her dealer with a lethal dose of fentanyl. It reached that conclusion based on reasonable inferences from the evidence presented at trial. Finding no error in the District Court or jury's decisions, we affirm Jacobs' convictions. But because the Court improperly imposed a general sentence, we vacate and remand to clarify the sentence specified for each count.

McKee, *Circuit Judge*, concurring in the judgment dubitante.[1]

I join the Majority's discussion of the jury-instruction issue, the *Batson* issue, and the sentencing error without reservation. I also concur in the judgment affirming the conviction for distributing heroin causing Therisa Ally's death. I do so, however, with strong reservations, which compel me to explain that my concurrence in the judgment is dubitante. I am dubitante about the result because the government's attempt to prove that Jacobs provided the heroin that killed Ally can best be described as cavalier and presumptuous. Nevertheless, the government need not negate all possible alternatives to Jacobs being the fatal dealer. Its burden is only proof beyond a reasonable doubt, not beyond all doubt.[2] Accordingly, given the very deferential standard governing our review of a jury verdict, I cannot disagree with the conclusion that the inferences here combined to clear the evidentiary threshold necessary to establish that Jacobs sold Ally the fatal dose of heroin. As Judge Ambro explains, the resulting conviction satisfies the "bare rationality" threshold—though just barely.[3]

I do, however, hope that if the government attempts to convict someone for distributing a controlled substance resulting in death in the future, it will present a more convincing and less inferential case than it did here. In prosecuting such a charge, the government must always thoroughly prepare and present the evidence. I write in the hope of advancing that end. Nevertheless, the standard of review compels me to reluctantly agree that the conviction for distribution causing death withstands this challenge, though only by the narrowest of margins.

**I.**

---

[1] The term "dubitante" is affixed to the name of the judge, "indicating that the judge doubted a legal point but was unwilling to state that it was wrong." *Dubitante*, BLACK'S LAW DICTIONARY (11th ed. 2019). *See, e.g.*, *Salvation Army v. Dep't of Cmty. Affs.*, 919 F.2d 183, 203 (3d Cir. 1990) (Becker, J., concurring dubitante).

[2] *United States v. Isaac*, 134 F.3d 199, 202 (3d Cir. 1998).

[3] Op. at 3.

A criminal conviction may surely rest upon reasonable inferences drawn from the evidence, as long as the totality of the evidence is sufficient to prove guilt beyond a reasonable doubt. Affirming this conviction for distribution resulting in death requires us to piece together several layers of inference. The result, though surviving our deferential review, comes perilously close to rank speculation. This could have been avoided if the government treated that charge with the seriousness that the enhanced penalty (indeed any criminal conviction) merits.

**A.**

The government's argument basically asks us to accept a syllogism that appears straight-forward: Collins sold Ally Butter heroin that he obtained from Jacobs, that heroin was laced with fentanyl, Ally's fentanyl measures were high enough to cause death, and she died with Butter heroin bags near her. Thus, argues the government, Collins is responsible for selling Ally the heroin/fentanyl mixture that killed her, and that is sufficient to establish Jacobs's guilt of distributing and conspiring to distribute the fatal dose beyond a reasonable doubt because Collins obtained it from Jacobs. Part of the foundation of this syllogism rests upon the evidence that the purse with Butter bags was found "immediately to the left of Ally's body"[4] and two empty Butter bags were "directly in front of where Ally was sitting."[5] According to the government's argument, these dots are sufficient for the jury to draw a line connecting Jacobs to Ally's fatal injection of fentanyl beyond a reasonable doubt when considered along with Kane's testimony about purchasing drugs from Jacobs.

Although, as I just noted, that line is sufficiently rigid to withstand our deferential review, this prosecution raises concerns that bear mentioning. I begin with the fact that there was no medical testimony that would have established that Ally either became immobile or died almost immediately upon injecting the fatal dose of heroin. Such testimony would have made any reliance on the proximity of the empty Butter bags more probative. The jury should not have had to infer that dying with a tourniquet meant that Ally became immobile or

---

[4] Appellee's Br. 3 (citing App. 486–87).
[5] *Id.* (citing App. 492–93).

2

died just after injecting the fatal dose of heroin.[6]  There is also testimony that her body had been repeatedly moved.  Thus, attempts to erect a logical inference based upon the proximity of Butter heroin to her lifeless body once police arrived is not nearly as probative as the government argues.  There is also no way of knowing the extent to which those in the room disturbed the location of the various packets and bundles of heroin that were ultimately found near her body.  Kane testified about where Ally was sitting when he went to sleep, but he did not testify about the location of any packets of heroin on the floor or in the room before the police arrived the next morning.  There is more.

**B.**

The government's evidence that Jacobs sold Ally the fatal dose of heroin was inconclusive.  When the DEA expert was asked whether drug dealers mix heroin with fentanyl "in precise quantities," he answered:

> No.  I mean, it's not an exact science.  Right.  So if you have -- your cutting agent is fentanyl and your powder here is heroin, and all you're doing is mixing it.  Some bags may not contain any fentanyl, some may contain a great -- higher concentration of fentanyl.  So there's no exact science when these guys are putting these packages together.[7]

Despite the variation in the quantity of the two drugs present in heroin mixtures sold on the street, the lab tested only one of the more than fifty small bags of Butter heroin from the sandwich bag that was collected for testing.  More than fifty other bags containing residue, on the floor and in the garbage can in the bedroom, were not even collected.  The government also failed to test the "brown substance" that was in a syringe found in Ally's bedroom.[8]  Moreover, as I shall elaborate below, the government offered nothing to allow the jury to conclude that the samples tested were representative of the samples found in the room.  There was absolutely no explanation offered to the jury to explain why the sampling that

---

[6] *See* Op. at 4.
[7] App. 778.
[8] App. 513–14.

was done provided a sufficient basis to extrapolate the contents of the unsampled bags of Butter heroin, let alone establish their contents beyond a reasonable doubt.

In *United States v. McCutchen*, we explained that when a defendant challenges a "determination that is based on extrapolation from a test sample, the district court must make a finding that there is an adequate factual basis for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability."[9]  There, we were deciding whether weighing a small sample of drugs seized from a defendant was sufficient to allow the court to determine the total weight of the drugs for sentencing purposes.[10]  That, of course, is a much lesser burden than the proof required to convict a defendant of a crime.  At sentencing, the government had relied on the weight of 15 of 119 vials of crack cocaine to extrapolate the total weight of the cocaine McCutchen possessed.  However, the evidence showed that all 15 of the tested vials contained crack cocaine, and a chemist testified about how the vials were selected for testing as well as the fact that the vials tested appeared the same as the vials not tested.  Here, there is no basis for the jury to reliably determine anything about the finding they were asked to make based upon an extrapolation, and the court did not attempt to give the jury any such guidance.

Given that testimony, we held that "a fairly strong inference arises that the remaining vials, which were seized in the same location during the same act of distribution, also contained crack cocaine."[11]  In concluding that this was sufficient to establish the weight of the drugs McCutchen possessed by a preponderance of the evidence for purposes of applying the Sentencing Guidelines, we relied in part on the decision of the Court of Appeals for the Second Circuit in *United States v. Pirre*.[12]

There, Pirre argued that the estimated weight of 15.09 kilograms was so close to the 15-kilogram sentencing threshold that all fifteen cocaine bricks that were seized from

---

[9] 992 F.2d 22, 23 (3d Cir. 1993).

[10] *Id.*

[11] *Id.* at 26.

[12] 927 F.2d 694 (2d Cir. 1991).

4

him should have been weighed. However, "all 15 packages appeared to be the same size, contained the same logo, were wrapped in the same type of electrical tape, and each appeared to be a standard one-kilogram brick."[13] Additionally, the chemist had tested eight of the fifteen bricks (more than half), and each contained cocaine. As a result, the district court found that the government had established, by a preponderance of the evidence, that the total weight of the cocaine Pirre possessed was 15.09 kilograms, and the Court of Appeals affirmed.[14]

In contrast, here, only one sandwich bag of Butter heroin was collected from the house. That sandwich bag contained fifty-two smaller bags, but only one of those was tested. Thus, only about 2% of what was collected was tested, and what was collected was only a fraction of what was found at the scene. There was no evidence about how the tested bag compared with those that were not tested, nor was there evidence that such a small sample size could support a reliable extrapolation. Nor was there any jury instruction about how the jury should consider the size of the sample[15] or whether it formed a sufficiently strong basis to conclude anything about the items that were not tested.[16] Moreover, as I have already noted, the government's own expert testified that there is absolutely no consistency in the proportion of fentanyl mixed in street drugs.

In addition, even ignoring the pitifully small sampling, there is no evidence about any similarity of size or weight of the Butter or Bulldog bags to allow one to conclude that the contents of the seized heroin were the same as the heroin that was not seized or tested. In fact, as I have just explained, the jury was informed that there is no generally accepted proportion of heroin to mixing agent. Thus, the evidence would only allow the jury to conclude that some of the packets that were not tested contained more fentanyl than the tested packets, some contained less, and some may not have

---

[13] *McCutchen*, 992 F.2d at 25.

[14] *Id.*

[15] However, defense counsel did not object to the lack of an instruction that would have guided the jury's finding about the accuracy of any sampling.

[16] *See* App. 851–80.

contained any. No government witnesses, including Dr. Coyer, the forensic toxicologist, provided any logic behind the choice to sample the particular bags tested out of the ones collected.

Yet there are still more problems with the government's attempt to prove Jacobs sold Ally the heroin that killed her. The tested Butter bag was taken from a nearby purse instead of from residue in an *emptied* bag on the floor or in the trashcan, and there is no evidence that the tested sample was from the same batch that Ally used the night of her death. Detective Cowdright explained the full bags were collected for testing instead of the empty ones because the empty bags had "nothing in them but residue" and thus "[t]here was no reason to send them."[17] However, the tested Bulldog bag had only a "residue amount[.]"[18] Nor was there any explanation of why the residue in the empty bags could not be tested. It is also logical to assume that the heroin that Ally used that night came from a bag that had only residue as the other bags appeared undisturbed.

When Kane conducted a controlled buy of Butter heroin from Collins the day after Ally's death, the heroin he bought contained fentanyl. The government argues that this suggests the fatal dose of fentanyl-laced heroin that killed Ally also came from Jacobs via Collins. But this is just more speculation that encounters the same problems of unexplained sampling and imprecise mixing.

## C.

These omissions are exacerbated because the laboratory tests only provided a *qualitative* analysis of the actual samples, not a quantitative one. Therefore, the government could not even establish the actual quantity of fentanyl in the bags that were sampled. It certainly could not establish the quantity of fentanyl in the Viking bags, which were not tested at all, or the eight untested Bulldog bags.

The government attempts to fill these holes by relying upon the fact that Jacobs stipulated that the drugs were tested using scientifically accepted methods. This argument totally

---

[17] App. 482.
[18] App. 155.

misses the point. Jacobs stipulated that each of the collected samples "was tested using scientifically accepted methods" and that the tested samples of Butter each contained a mixture of heroin and fentanyl.[19] But that does not establish whether the quantity of fentanyl present in the tested samples was lethal or whether sufficient bags of heroin were sampled to conclude that the remaining packets also contained fentanyl. Moreover, the DEA testimony established that some of the remaining bags probably contained no fentanyl.

**D.**

The government argues that the Viking bags were in the zippered compartment of Ally's closed shoulder bag and that it is therefore unlikely that she obtained her fatal dose from those bags. It relies, in part, upon testimony from Detective Cowdright. He testified that Ally's closed shoulder bag was a "to-go bag for drug users" to imply that she relied upon those Viking bags when outside the apartment.[20] The government contrasts those bags to the Butter bags strewn on the floor and on top of a trashcan in the apartment. However, concluding that Ally did not use drugs from her "to-go bag" the night of her death is not without problems. The government did not even establish whether the compartment of her bag containing the Viking packets was zippered closed when it was found. This argument thus did not have the benefit of the stronger inference that could have arisen if her bag had been zippered closed. It is reasonable to assume that one who is intent on getting high would not close the bag she retrieved the drugs from before using them.

The government also made no attempt to establish the source of the Viking bags. That heroin certainly was never tied to Jacobs. Though the government established that Jacobs supplied Butter heroin to Collins who then sold it to Ally, she may have had additional dealers. Ally's boyfriend, Kane, even testified that sometimes her friend Patrick drove her to get drugs. In fact, Patrick drove her to get drugs from Collins on the night of her death. For reasons known only to the government, Patrick was neither called to testify at trial nor

---

[19] App. 115.
[20] App. 476.

7

even interviewed by Detective Cowdright.[21] There was thus no way to know if Patrick had also taken Ally to purchase drugs from someone other than Collins on the night of her death, and the government apparently made no effort to eliminate that possibility.

Even if Ally did buy exclusively from Collins, he testified that he could not remember if he had ever sold a Viking or Bulldog bag, as he had "sold so many different stamps."[22] Collins also testified that he had been dealing Jacobs's drugs exclusively for only three months before Ally's death. Collins had dealt to Ally for the past two-and-a-half years. Accordingly, Ally may have kept the drugs Collins sold prior to those three months or drugs from other dealers in her "to-go" bag. Since she may have taken drugs from that bag the night of her overdose and none of that was tied to Jacobs, the fatal dose could have come from a supply that was not traceable to Jacobs.

## II.

Of course, as I noted at the outset, the government need not negate all possible alternatives to Jacobs being the fatal dealer. Its burden is only proof beyond a reasonable doubt, not beyond all doubt.[23] The government, however, *was* required to produce a case that does not undermine public faith in judicial proceedings. Yet that is exactly what it did here by submitting a case with so many gaps and blatant failures in its investigation. Nevertheless, because the threshold for our review is so low and the totality of the evidence rises slightly above pure speculation, as Judge Ambro explains, I simply cannot conclude that the government's long list of failures here left the jury with insufficient evidence to find Jacobs guilty beyond a reasonable doubt. Even though it comes perilously close to doing so.

---

[21] App. 508–09 (Q: "[D]id any member of law enforcement involved in this investigation interview Patrick?" A: "We had discussed it. I don't know if he was interviewed by the DEA or not." "Would they have told me? . . . I'm not too sure. I don't have any information on whether Patrick was interviewed by them or not.").

[22] App. 669–70.

[23] *Isaac*, 134 F.3d at 202.

Moreover, although I am troubled by the extrapolation problems that I have pointed out, as well as the absence of a quantitative analysis, it is undisputed that Ally consumed a fatal dose of fentanyl that was mixed with heroin. Also, Kane's testimony does establish that it was more likely than not that the heroin she ingested came from Jacobs—even though the link is a tenuous one. Thus, for the reasons Judge Ambro explains and that I have tried to point out, the evidence and testimony that the government did manage to present at trial just barely crosses the very low threshold necessary under plain-error review. I therefore agree that there is enough evidence for the jury to have found Jacobs guilty beyond a reasonable doubt.

That certainly does not prevent me from explaining the problems with this evidence, the highly speculative nature of it, or the tenaciously tenuous thread connecting Jacobs with Ally's fatal heroin injection. I also think it is important to note that the failure of the government to adequately do its job here unnecessarily complicated the jury's decision-making and thus our review.

Nevertheless, because the evidence barely crosses the necessary threshold for finding sufficient evidence, I reluctantly join the Majority in finding a rational juror could have decided Jacobs was guilty beyond a reasonable doubt—for all the reasons Judge Ambro explains.