

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-9-1999

# USA v. Mastrangelo

Precedential or Non-Precedential:

Docket 98-1469

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Mastrangelo" (1999). *1999 Decisions.* Paper 95.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/95

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 9, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1469

UNITED STATES OF AMERICA

v.

ADRIAN MASTRANGELO, JR.

Adrian Mastrangelo,
         Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 94-cr-00522-5)
District Judge: Hon. Anita B. Brody

Argued December 17, 1998

Before: SLOVITER and COWEN, Circuit Judges,
and RODRIGUEZ,* District Judge

(Filed April 9, 1999)

Stephen P. Patrizio (Argued)
Dranoff & Patrizio
Philadelphia, PA 19103

 Attorney for Appellant

_____
*Hon. Joseph H. Rodriguez, United States District Judge for the District
of New Jersey, sitting by designation.

        Ewald Zittlau (Argued)
         Assistant U.S. Attorney
        Michael R. Stiles
         U.S. Attorney
        Walter S. Batty, Jr.
         Assistant U.S. Attorney, Chief of
         Appeals
        Philadelphia, PA 19106

         Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Defendant Adrian Mastrangelo, Jr., appeals his conviction following a jury trial for conspiracy to manufacture methamphetamine in violation of 21 U.S.C. S 846. He was charged on two counts of a 12-count indictment with conspiracy to manufacture methamphetamine and attempt to manufacture methamphetamine. The jury convicted him of the conspiracy charge, and acquitted him of the charge of attempt to manufacture methamphetamine. Post-trial, Mastrangelo moved for acquittal pursuant to Federal Rule of Criminal Procedure 29(c) or, alternatively, for a new trial under Rule 33. The District Court denied both motions. United States v. Mastrangelo, 941 F. Supp. 1428, 1443 (E.D. Pa. 1996).

On the acquittal motion, the District Court concluded, first, that there was sufficient evidence (viewed in a light most favorable to the government) for a jury to conclude that defendant was guilty of the conspiracy beyond a reasonable doubt. Second, it held that the allegedly outrageous conduct of the government in failing to preserve evidence did not demonstrate any bad faith, because there was no showing that the government knew the exculpatory value of the evidence at the time. Third, it concluded that the misdeeds of the government, which included allegations

2

of permitting perjured grand jury testimony, were harmless errors and did not substantially influence the grand jury's decision to indict.

The District Court also rejected each of the seven grounds underlying the motion for a new trial. The court held Mastrangelo lacked standing to challenge the search of the storage locker in which the methamphetamine equipment and ingredients were found, and concluded that it did not err in admitting into evidence a videotape showing defendant opening the storage locker, co-conspirators' statements, a stipulation intended to avoid the introduction under Federal Rule of Evidence (FRE) 404(b) of evidence of Mastrangelo's prior conviction for methamphetamine manufacture, the laboratory analysis showing methamphetamine was present on equipment found in the locker but damaged or destroyed before the defendant could test the equipment, and photographs of other items later destroyed. Finally, the District Court determined that prosecutorial misconduct in the closing statements and rebuttal either was cured or lacked an improper effect on the jury. Thus, the court concluded that its earlier refusal to declare a mistrial was not error.

The District Court sentenced Mastrangelo to 262 months' imprisonment, the lowest possible on his offense level of 34, and ten years' supervised release, but waived thefine. Mastrangelo filed a timely appeal. We have jurisdiction under 28 U.S.C. S 1291.

II.

A.

SUFFICIENCY OF THE EVIDENCE

There are a number of highly problematic issues raised on this appeal. Because of the conclusion we ultimately reach on the issue of prosecutorial misconduct, we will discuss some of the other issues only briefly.

One of the contentions Mastrangelo presses most vigorously is that there was insufficient evidence to support

3

the jury's verdict of guilty on the conspiracy charge. In order to establish a conspiracy, the prosecution must prove:

> (1) a shared "unity of purpose,"
>
> (2) an intent to achieve a common goal, and
>
> (3) an agreement to work together toward the goal.

United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988). This proof incorporates a demonstration that a defendant has "knowledge of the illegal objective contemplated by the conspiracy." Id. at 91.

### 1. The Evidence Against Mastrangelo

The District Court held there was sufficient evidence of Mastrangelo's involvement in the conspiracy to manufacture methamphetamine based on the following evidence, which was detailed in the District Court's opinion.

Michael DeJulius, Raymond D'Aulerio, and Adrian Mastrangelo, III (Adrian III), defendant's son, pled guilty to conspiracy to manufacture and distribute methamphetamine from approximately July 30 to October 4, 1993. Paul Rosa, a cooperating witness who acted for the government, sought to purchase methamphetamine from DeJulius and D'Aulerio, but they lacked methylamine, a necessary ingredient. In what the District Court characterized as a "reverse sting"[1] organized by the government, Rosa gave DeJulius the methylamine on August 5 in four bottles in a white box with the name "J.T. Baker," a chemical supply company, on the side of the box. This name became the basis by which the government could identify the box. DeJulius gave the box to a second person who gave it to Adrian III, who, in turn, brought it to "Garage G," a garage on Latona Street in Philadelphia. Several hours later, Adrian III returned to get "what appeared to be the box" and moved it to his own house nearby. Mastrangelo, 941 F. Supp. at 1431.

---

1. The current United States Sentencing Guidelines Manual describes a "reverse sting" as "an operation in which the government sells a controlled substance to a defendant." U.S.S.G.S 2D1.1, comment. (n.15).

On August 7, Mastrangelo, driving his own Jeep, went to his son's house, and minutes later the two left with Adrian III driving the Jeep and Mastrangelo driving a white van. They drove to another location in the same neighborhood where they loaded various items into and out of the van. Thereafter, they switched vehicles with Adrian III driving the van and Mastrangelo driving the Jeep, and drove back to Garage G, where they moved various items into, and possibly out of, the van. Id.

The two then drove on I-95, a north-south expressway, to a storage facility in Bristol, Pennsylvania. Along the way they exited and reentered the highway once and exchanged the lead a few times, but they always drove within the speed limit, in what the District Court, based on trial testimony, stated might have been a counter-surveillance measure. After they left the highway, Mastrangelo parked the Jeep at a nearby apartment complex and joined his son in the van before they drove to the storage facility. They punched the security-gate code at the entrance to the facility, using what company records showed was the code for storage locker H-16, remained for five minutes, and then drove both vehicles back to Philadelphia. Id.

The storage locker H-16 was rented in the name of someone who has not been located. The address listed on the rental lease, however, was for an apartment in the complex where Mastrangelo lived. The contact phone number listed on the lease was for a phone located at an address where Mastrangelo had previously lived and at which two automobiles were still registered to him. A handwriting expert testified that the lease for the locker was probably signed by Mastrangelo and the locker rental agent testified that the renter was approximately the same height, age, and hair color as Mastrangelo, but neither witness's testimony was unequivocal. Id. at 1432.

Although the government maintained surveillance at the storage facility, company records revealed that someone, without the government's knowledge, used the security code for locker H-16 on August 8 to enter the facility and remained about ten minutes. Thereafter, the government covertly searched locker H-16 on August 25 and found the J.T. Baker box, some ingredients and equipment necessary

5

for manufacturing methamphetamine, and one of the marked bottles, now empty, with a residue of methylamine. The government photographed the contents of the locker before returning everything to its original state. Later, on September 17, it seized all the drug-related materials from the locker. Among the items seized were ingredients and equipment necessary to make methamphetamine except for phenyl-2-propanone, the most expensive ingredient, and methylamine. Adrian III's fingerprint was on the methylamine bottle. Mastrangelo's fingerprint was on a funnel but there is no way to know the date when the fingerprint was made. A government agent stated that it was common to store some of the materials in separate places and opined that whoever controlled the locker was either the financier or the "cook." Id.

On October 4, the government executed search warrants for the residences of DeJulius, D'Aulerio, and Adrian III, as well as for Garage G. Documents belonging to Mastrangelo and Adrian III and an old catalogue for chemical supplies were found at the garage. Id.

On October 7, Mastrangelo went to the storage locker, which was now empty except for some domestic items, removed the padlocks, and abandoned the locker and the few remaining items. He also transferred the title for his Jeep to his girlfriend, and reregistered a truck he had previously purchased to another person, although he was still using the truck a year and a half later. The storage company attempted unsuccessfully to contact someone associated with the locker rental: one contact telephone number was disconnected and the person at the other could not explain why his number was used on the lease. Mastrangelo was arrested at his sister's house more than a year and a half later. Id. at 1432-33.

2. The District Court's Analysis of the Evidence

The District Court concluded that the circumstantial evidence supported the inference that Mastrangelo knew what materials were in H-16. The court referred to the two-vehicle trip to the storage locker in August as one transporting the methylamine, id. at 1434.

6

The District Court concluded that the jury could have inferred that Mastrangelo "facilitated the goals of the conspiracy by allowing materials which he knew were for the manufacture of methamphetamine to be stored in[the] locker over which he had control during the life of the conspiracy." Id. at 1434. The court held that the jury could have found that Mastrangelo controlled the locker because of the testimony of the handwriting expert and the rental agent, together with evidence that the misinformation on the lease appeared designed to hide the identity of the actual lessee. Id. Finally, the District Court took evidence that Mastrangelo fled after discovering the empty locker and transferred certain assets, such as the vehicles, as proof of Mastrangelo's guilt.

3. This Court's Precedents

In several prior cases, this court has overturned convictions for conspiracy in drug possession and distribution because of the absence of any evidence that the defendant had knowledge that drugs were involved. In Wexler, 838 F.2d at 90–92, we reversed the defendant's conviction because there was no evidence that the defendant, who acted as a lookout and spoke with some of the conspirators, knew what was behind the closed doors of a truck that contained drugs. Although we believed that Wexler probably suspected "that some form of contraband was involved," that suspicion was insufficient to prove knowledge of the conspiracy's objective. Accord United States v. Cooper, 567 F.2d 252 (3d Cir. 1977) (reversing conviction because there was no proof that defendant, who rode cross-country in truck, knew locked compartment contained drugs). In United States v. Salmon, 944 F.2d 1106 (3d Cir. 1991), there was evidence that the defendant performed surveillance, possessed surveillance equipment, spoke to the conspirators, and opened the trunk of a car from which the government contended a wrapped package was removed. Id. at 1113–15. After comparing the case to Wexler, we held the evidence insufficient to show that the defendant knew what was in the package, declining the government's invitation to rule that the defendant's suspicious movements near the trunk were sufficient to support the conviction. Id.

7

More recently, in United States v. Thomas, 114 F.3d 403 (3d Cir. 1997), we held that the prosecution had failed to prove that the defendant, who, in exchange for $500, went to a hotel room to see whether the room contained a suitcase, knew the suitcase contained drugs. There was evidence that several calls were made from a conspirator's phone to the defendant's home, pager, and cell phone, but no evidence that the defendant knew any of the conspirators. We concluded that the government had shown that the defendant knew his activities were illegal, but not that he knew drugs were involved.

And in United States v. Idowu, 157 F.3d 265 (3d Cir. 1998), we held there was insufficient evidence to convict a defendant who arrived in a car with one of the participants, was present during several conversations among the conspirators, owned and carried the bag containing the money, and knew that the money was to buy something that would fit into a suitcase, because there was no evidence that any of the conspirators ever mentioned illegal drugs in the defendant's presence. But see United States v. Touby. 909 F.2d 759, 771–72 (3d Cir. 1990) (upholding conviction based on evidence that defendant received boxes containing necessary chemical ingredients to make drugs and that recipes and a laboratory for making the drugs were found in her marital bedroom), aff 'd on other grounds, 500 U.S. 160 (1991)).

At oral argument, the government sought to distinguish these cases from the one against Mastrangelo and, methodically reviewing the evidence it presented, step by step, piece by piece, made a vigorous argument that the evidence here was sufficient to sustain Mastrangelo's conviction. Although the evidence against Mastrangelo was indirect, we believe that it was sufficient to permit the District Court to send the case to the jury. The other cases where we overturned the defendants' convictions involved charges of conspiracy to possess a controlled substance (often cocaine) and the missing ingredient was the defendants' knowledge of the substance. Here, however, Mastrangelo is charged with conspiracy to manufacture methamphetamine, which is more like the conspiracy to manufacture scenario presented by our decision in Touby,

8

909 F.2d at 771-72. There, the wife defendant had argued there was insufficient evidence to support the jury's finding of her guilt because there was no direct evidence of the manufacture of the controlled substance. We held that evidence of chemicals, recipes for the manufacturing process, and a laboratory in the marital bedroom was sufficient, although circumstantial, to permit the jury to infer that she had the requisite knowledge, despite her assertion that the chemical ingredients were only for a T-shirt business.

Here, the government presented evidence, albeit slim and circumstantial, from which the jury could infer that Mastrangelo saw the boxes with the relevant equipment and ingredients in the storage locker, joined with Adrian III, a co-conspirator, to travel surreptitiously to the storage locker, where the government subsequently found many of the ingredients to manufacture methamphetamine, and had control of that locker. Together with the Stipulation that Mastrangelo had the chemical background to know the equipment and ingredients necessary to make methamphetamine, and the requirement that we view the evidence in the light most favorable to the government, as the verdict winner, this evidence is sufficient, but concededly barely, to support a jury's inference as to Mastrangelo's connection to the illegal conspiracy to manufacture that was at the heart of the government's case. Nonetheless, the slimness of the evidence is relevant to our ultimate disposition.

B.

RULE 404(b): PRIOR CRIMES EVIDENCE

The government sought to introduce evidence that Mastrangelo was convicted in federal court in 1984 of conspiracy to manufacture, to possess with intent to distribute, and to distribute methamphetamine, and in state court in the same year. The District Court rejected the government's effort to introduce evidence of the state conviction but granted its motion as to evidence of the federal crime. To avoid the prejudicial effect of the

9

government's introducing evidence of the prior crime, the defendant agreed to stipulate that he "had the chemical background to know the ingredients and equipment necessary to make methamphetamine." Supp. App. at 822–23. See United States v. Jemal, 26 F.3d 1267, 1272–75 (3d Cir. 1994) (approving use of stipulations to avoid prejudice flowing from admission of prior crimes evidence). To ensure that the Stipulation was voluntary, see United States v. Miller, 588 F.2d 1256, 1263–64 (9th Cir. 1988), the District Court asked the defendant to take the stand and confirm that he understood the Stipulation and that acceptance was voluntary, which the defendant did. Supp. App. at 830–33. Thereafter, the District Court advised the jury of the Stipulation and did not admit evidence of the 1984 conviction.

Ordinarily, defendant's agreement to the Stipulation, on the informed advice of counsel, would preclude any objection on appeal. Here, Mastrangelo argues that the Stipulation was induced by the District Court's erroneous ruling that Mastrangelo's prior crime was admissible.

The Supreme Court has held that admissibility under FRE 404(b) requires: (1) a proper evidentiary purpose; (2) relevance under FRE 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under FRE 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used. See Huddleston v. United States, 485 U.S. 681, 691–92 (1988), cited in United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992). The admission of prior crimes evidence under Rule 404(b) is a matter for the District Court's discretion, provided that the court explains how the probative value of the evidence outweighs its prejudicial effect; if such an explanation is lacking, and the record does not clearly support the finding of probative value, the court of appeals will do the balancing itself. United States v. Himelwright, 42 F.3d 777, 781, (3d Cir. 1994).

To meet the first requirement and show a proper evidentiary purpose, the government must "clearly articulate how that evidence fits into a chain of logical inferences" without adverting to a mere propensity to commit crime now based on the commission of crime then.

10

Sampson, 980 F.2d at 887. The government sought to admit the evidence of Mastrangelo's prior conviction to show Mastrangelo knew of the conspiracy's objectives and intended to participate therein, but could not easily articulate a chain of logical inferences that would have made the prior crime evidence relevant to those issues. Ultimately, the District Court stated that it would admit evidence of the federal crime for purposes of proving knowledge but not to show intent. Supp. App. at 723.

The court determined that the second requirement, relevance, was met because the prior conviction established that Mastrangelo knew that the materials found in the storage locker could be assembled to manufacture methamphetamine.

On the third prong, the court summarily stated that the probative value outweighs the prejudice to Mastrangelo, despite defense counsel's repeated assertions that the government could establish Mastrangelo's knowledge of the ingredients and equipment through alternate means.

Finally, on the fourth prong, the District Court declined to provide a limiting instruction concerning the stipulation although it would have been obligated to provide such an instruction had it admitted evidence of the prior crime itself.

We review the District Court's determination on the admissibility of the evidence under the usual standard of abuse of discretion. Although there may have been adequate bases for the District Court's findings concerning three of the four prongs, the failure of the District Court to provide a clear explanation regarding the balance between the evidence's prejudicial and probative effects is troubling, particularly because the Stipulation plays an important part in our analysis of the alleged prosecutorial misconduct. However, we need not decide whether the court erred in holding the government could introduce evidence of Mastrangelo's prior crime because we believe another issue is dispositive.

11

C.

PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENTS

It will be recalled that the Stipulation was a limited one: Mastrangelo "had the chemical background to know the ingredients and equipment necessary to make methamphetamine." Significantly, Mastrangelo did not stipulate that he knew how to make methamphetamine. The difference is important. In fact, the District Court refused the prosecutor's request that the Stipulation contain language that Mastrangelo knew the process needed to manufacture methamphetamine. App. at 634a1–634a2.

Mastrangelo argues that the prosecutor's statements regarding the Stipulation made in her closing and rebuttal arguments went beyond the parameters of the Stipulation itself. Mastrangelo focuses on a number of specific remarks.

In the first statement at issue, the prosecutor stated:

> When I opened . . . I told you what I was going to prove and I said [that] there will be more. And what more did I prove to you? The stipulation. The defendant has the chemical background to know the ingredients and equipment necessary to make methamphetamine.
>
> There is no evidence concerning anyone else involved in this conspiracy whether known or unknown.

App. at 732 (emphasis added). Mastrangelo's counsel objected, and the district court sustained counsel's objection but refused to order a mistrial. App. at 732.

Moments later, the prosecutor directly mischaracterized the Stipulation, remarking, "[T]he defendant knew, based upon that stipulation, I submit to you how to make methamphetamine. I believe that is clear." App. at 732.

Later, in the prosecutor's closing statement, the prosecutor again misrepresented the Stipulation, stating that Mastrangelo "had the knowledge, the knowledge to either make it--make the methamphetamine  or to tell someone else how to make it." App. at 735 (emphasis added). Then, the prosecutor argued:

12

That combined with the stipulation of knowledge, I would submit to you shows that the defendant passed the stage of just thinking about committing a crime and form[ed] the actual intent to do that crime, to manufacture methamphetamine.

App. at 736. The defense again moved for a mistrial, and again the District Court denied the motion.

The impropriety of these statements is evident. They distort the substance of the Stipulation, inflating the limited stipulation that Mastrangelo had the chemical background to know the ingredients and equipment necessary to make methamphetamine to encompass a meaning that the District Court had previously ruled unwarranted, i.e., that because of his knowledge of the ingredients and equipment needed, Mastrangelo knew how to make methamphetamine. Furthermore, the prosecutor's statement that there was no evidence that anyone else had similar knowledge impermissibly shifted the burden of proof to Mastrangelo to demonstrate that one of the other conspirators knew how to make methamphetamine.

The District Court agreed that the prosecutor's statements improperly shifted the burden to the defendant, and discussed giving a curative instruction, but allowed the jury to go to lunch before giving one. After the jury returned and before the defendant's closing argument, the court gave the following curative instruction regarding the Stipulation:

The parties stipulated that the defendant had the chemical background to make methamphetamine. The Government, Ms. Howard, in its closing made reference to the fact [that] there was no evidence presented that anyone else had this chemical background and that therefore by inference the defendant, since he possessed this knowledge, must necessarily have been the maker.

Such an inference is improper and should be stricken from your minds. There was no burden on the defense to produce evidence that no one else did or did not possess chemical knowledge to make methamphetamine.

13

Furthermore, there is no evidence in this case that no one else did not have the knowledge to make methamphetamine.

App. at 747-48 (emphasis added). Ironically, the court's statement in the curative instruction that the defendant "had the chemical background to make methamphetamine" misstated the Stipulation and repeated one of the prosecutor's misstatements, thereby compounding the error.

In rebuttal, the prosecutor once again improperly equated the chemical background to know the ingredients and equipment necessary to make methamphetamine and the knowledge of how to make methamphetamine, when she said:

[T]hat's the difference between your knowing now what the ingredients are and how to make a cake, than someone who had the chemical background to know the ingredients and equipment necessary.

App. at 749 (emphasis added). The analogy is a poor one. A child or a spouse may go to the store to buy the ingredients to make a cake but not know what to do with them once in the kitchen. The District Court sustained the defense objection after which the following revealing sidebar discussion took place:

MS. HOWARD:  Just -- I really don't get this one.

THE COURT:  I know you don't.

MS. HOWARD:  I do apologize.

THE COURT:  I know you really don't get it.

MS. HOWARD:  I really don't.

THE COURT:  You don't get it.

MS. HOWARD:  Okay.

THE COURT:  You don't get it.

MR. PATRIZIO:  Defendant moves for a mistrial.

THE COURT:  I'm considering it.

MS. HOWARD:  Judge --

14

        THE COURT:  I'm considering it.

        MS. HOWARD:  -- would you explain to me? I don't
        get it.

App. at 750. Apparently, the prosecutor did not recognize
the difference between having the chemical background to
know the ingredients and equipment needed to make
methamphetamine and knowing the process to make the
drug.

Many of the cases dealing with improper prosecutorial
comments have arisen in the context of prosecutorial
vouching but the legal issues are equally applicable here. In
deciding whether the prosecution has improperly
commented at trial, the court should look to the overall
context of the statements in the trial record. United States
v. Young, 470 U.S. 1, 11 (1985). Improper prosecutorial
comments may lead the jury to infer that the prosecutor
knows undisclosed facts which she could not present to the
jury. See United States v. Walker, 155 F.3d 180, 186 (3d
Cir. 1998).

Review of the legal standard enunciated in a jury
instruction is plenary, see United States v. Johnstone, 107
F.3d 200, 204 (3d Cir. 1997), but review of the wording of
the instruction, i.e., the expression, is for abuse of
discretion. United States v. Zehrbach, 47 F.3d 1252, 1264
(3d Cir. 1995) (en banc). If we conclude that a comment
was improper, we must apply a harmless error analysis,
looking to see if "it is highly probable that the error did not
contribute to the judgment." Id. at 1265 (internal quotation
marks omitted). The high probability standard is met when
the court possesses a "sure conviction" that the error did
not prejudice a defendant. Id. (internal quotation marks
omitted).

We have looked to three factors to determine whether
there was prejudice: the scope of the improper comments in
the overall trial context, the effect of any curative
instructions given, and the strength of the evidence against
the defendant. Id. Turning first to the place of the improper
comments in the context of this case, we must conclude
that they were central. The prosecution sought to have the
jury infer that Mastrangelo was the "cook," that is, the

15

individual who actually turned the ingredients into methamphetamine, but it had no evidence, direct or indirect, of that fact. If the prosecutor could convince the jury that Mastrangelo was the only conspirator who knew how to make methamphetamine, the jury might reasonably draw that inference. However, there was no evidence that Mastrangelo knew how to make methamphetamine, and it was highly improper, whether intentionally or inadvertently, to shift the meaning of the Stipulation to fill in that missing link.2

Arguably, a clear and forceful curative instruction from the District Court might have cured the potentially devastating effect of the prosecutor's misrepresentations. In this case, unfortunately, the District Court itself misstated the content of the Stipulation, which, even if it did not further confuse the jury, certainly did not effect a cure.

Finally, as we discussed above, this is not a case where the evidence of guilt is overwhelming. Quite the contrary. The only conspirator whom the government could show Mastrangelo knew and contacted was his own son. There is no direct proof that Mastrangelo actually went to the locker on August 7. Moreover, even if he went to the locker on that day there is no direct proof that he saw the same contents that the government photographed on August 25 (its first access to the locker) because the person who entered the facility on August 8 using the code for locker H–16 and who remained there for ten minutes may have placed some or all of the potentially incriminating material in that locker. Similarly, there is no direct proof that Mastrangelo assisted in transporting to the storage locker the methylamine provided through the government. The government agents lost surveillance of the bottles at some point after the initial controlled delivery. The government conceded that it was unable to maintain an uninterrupted view of the various homes and garages involved. Finally,

_____

2. At oral argument, the government suggested that the Stipulation was used only in connection with the attempt charge. The record shows otherwise. See Trial Tr. April 17, 1996 at 66 (prosecutor refers to contents of Stipulation as part of the evidence that showed that Mastrangelo "was willfully a part of the conspiracy.").

16

there is no direct evidence that Mastrangelo had any knowledge of the conspiracy's plan to manufacture methamphetamine.

Although we concluded earlier that the jury could have cumulated the permissible inferences to find sufficient evidence to convict Mastrangelo of participation in the conspiracy, there was no evidence, absent the prosecutorial misstatements and the faulty curative instruction improperly extending the Stipulation, from which the jury could have inferred that Mastrangelo knew how to make methamphetamine. Therefore, in this pivotal context, the misstatements dramatically enhanced Mastrangelo's alleged role in the conspiracy without supporting evidence.

The Stipulation was therefore crucial. The government's repeated misrepresentations of that stipulation and the faulty curative instruction, when considered under the required analysis, were not harmless. We cannot possess a "sure conviction" that these errors regarding the Stipulation did not prejudice Mastrangelo and have significant effect on the jury's decision.[3]

III.

For the reasons set forth, we will reverse the order of the District Court denying defendant's motion for acquittal or, in the alternative, a new trial, and will remand for a new trial.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

3. In light of our holding, we need not consider the other errors Mastrangelo raises in his brief.

17