**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-3116, 18-3781, & 18-3782
_____

UNITED STATES OF AMERICA

v.

COREY HAMLET
        Appellant in 18-3116

&

TONY PHILLIPS
        Appellant in 18-3781

&

AHMAD MANLEY
        Appellant in 18-3782
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 2:14-cr-00220-001, 2:14-cr-00220-003, & 2:14-cr-00220-004)
District Judge: Honorable Madeline C. Arleo
_____

Argued: May 7, 2024

Before: PORTER, MONTGOMERY-REEVES, and ROTH, *Circuit Judges.*

(Filed: June 4, 2025)

_____

Robert L. Sirianni, Jr. **[ARGUED]**
Brownstone
P.O. Box 2047
Winter Park, FL 32790

     *Counsel for Defendant-Appellant, Corey Hamlet*

Annette Verdesco
Caruso Smith & Picini
60 Route 46 E
Fairfield, NJ 07004

     *Counsel for Defendant-Appellant, Ahmad Manley*

Robert Epstein **[ARGUED]**
Federal Community Defender Office for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

     *Counsel for Defendant-Appellant, Tony Phillips*

Mark E. Coyne **[ARGUED]**
Office of the United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

     *Counsel for Appellee, United States of America*

_____

OPINION[*]

_____

PORTER, *Circuit Judge*.

     A jury convicted Corey Hamlet, Ahmad Manley, and Tony Phillips of murder,

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

attempted murder, use and carrying of a firearm during a crime of violence, assault, racketeering, and conspiracy. Hamlet, Manley, and Phillips appeal, raising challenges to evidentiary rulings, the jury composition, and alleged misstatements in the prosecution's summation. For the reasons below, we will affirm the convictions.

I

The violence underlying this case arose between two rival factions favoring or disfavoring Corey Hamlet, the "Triple OG" (leader) of the Newark Crips gang. Tariq "Live Wire" Johnson, in charge of the Crips' Court Street location, opposed Hamlet, and aspired to displace him. Johnson was closely aligned with Almalik Anderson, a drug dealer feuding with Hamlet. Anderson had been warned by the Crips that he could no longer operate at Court Street, but he continued his activities with Johnson's blessing. One of Anderson's customers and a fellow Crip was Anwar West.

Hamlet loyalists within the Crips disliked Johnson and Anderson for their opposition to Hamlet. These loyalists included Corey Batts, Ahmad Manley, Tony Phillips, Abdul Healy, and Dennis Wright.

In May 2013 the feud exploded into deadly violence after Batts, Wright, Manley, and Phillips, with Hamlet's blessing, hatched and executed a plan to kill Johnson. The quartet, together in Manley's car, then attempted to kill Anderson in a drive-by shooting. While Anderson survived, Batts was shot in the finger, and Manley drove him to a nearby emergency room. After the failed attempt, Anderson directed an associate to murder Healy. Hamlet retaliated by ordering Aaron Terrell to murder West.

3

Overlapping these events was a massive federal investigation into the Crips. Batts was charged in November 2013, Phillips in November 2015, Hamlet in February 2016, and Manley in August 2016. This led to a trial that began in Fall 2017, including Hamlet, Phillips, Manley, and several other Crips as defendants.

The government secured the cooperation of Crip-affiliated witnesses for trial, notably including Batts, Wright, and Terrell, who had firsthand knowledge of the feuds within the gang. Batts attested to how he, Phillips, and Wright had killed Johnson, and how he, Manley, Phillips, and Healy tried to kill Anderson—all with Hamlet's approval. Wright attested that he helped Phillips and Batts kill Johnson with Hamlet's approval, corroborating Batts' testimony. Terrell admitted to three murders he had committed on Hamlet's orders, including the murder of West, and described the feud between Hamlet and Anderson. The government called a number of evidentiary witnesses, including for ballistics evidence related to the murders of Johnson and West, and to the attempted murder of Anderson. The government also called FBI Special Agent Ajit David to introduce Cell Site Location Information ("CSLI") evidence—data retrieved from cell towers tracing the physical locations of phones linked to Defendants. Hamlet testified in his own defense.

The trial lasted more than five months. The jury reached a verdict on only three counts and was hung on the rest. On April 2, 2018, the District Court declared a mistrial on the remaining counts. Before the retrial, the government successfully moved to sever Hamlet, Manley, and Phillips from the other defendants. After retrial, a jury found Hamlet, Manley, and Philips guilty on all counts except for one racketeering predicate.

4

Hamlet and Phillips were both sentenced to life in prison, and Manley was sentenced to 420 months' imprisonment.

Hamlet, Phillips, and Manley appealed.

## II

The District Court had original jurisdiction over these prosecutions pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

Defendants Hamlet, Phillips, and Manley collectively raise four issues on appeal. First, Manley and Phillips argue that the District Court erred by improperly admitting Agent David's expert CSLI testimony. Second, all Defendants argue that the District Court erred by denying their *Batson* challenges. Third, Hamlet argues that he is entitled to a new trial on a pair of evidentiary grounds: an alleged Jencks Act violation, and the introduction of improper character evidence during his cross-examination. Fourth and finally, Manley and Phillips argue that their convictions should be vacated because of the government's characterization of CSLI evidence in its summation. We address each in turn, recounting the relevant facts as needed.

## A

Defendants raised *Daubert* challenges to Agent David's expert CSLI testimony before the first trial but did not re-raise them before or during the second. Manley and Phillips argue that the initial *Daubert* objection was enough to preserve this issue for appeal, even though their lawyers affirmatively stated "no objection" to the CSLI testimony and slides at the second trial.

If not waived, "[w]e review the admissibility of expert testimony for an abuse of discretion." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 831 (3d Cir. 2020). "If we find abuse, 'we review de novo whether that error was prejudicial or harmless.'" *Id.* (quoting *United States v. Schneider*, 801 F.3d 186, 200 (3d Cir. 2015)). But if an issue is waived, "we conduct no further analysis of the claimed error" absent exceptional circumstances. *United States v. James*, 955 F.3d 336, 345 (3d Cir. 2020).

An objection at the first of two trials may preserve the issue for appeal if that issue "did not change between the two trials." *United States v. Hoffecker*, 530 F.3d 137, 165 (3d Cir. 2008). Requiring a party to re-raise a largely legal issue—such as the statute of limitations question at issue in *Hoffecker*—"would be an exercise in wasteful formality." *Id.* (quoting *United States v. Sanders*, 485 F.3d 654, 657 (D.C. Cir. 2007)). By contrast, a mid-trial evidentiary ruling subject to "different factual and evidentiary circumstances occasioning a new exercise of the district court's discretion" requires a fresh objection in a successive proceeding to avoid forfeiting or waiving the issue on appeal. *Id.* (quoting *Sanders*, 485 F.3d at 657).

Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Offering up "no objection" during a proceeding can constitute waiver depending on the context. In *United States v. Brito*, we found forfeiture—not waiver—in counsel's "honest error" of tacitly endorsing what turned out to be an inaccurate

statement made by the district court in a colloquy. 979 F.3d 185, 189–90 (3d Cir. 2020). We contrasted that context with the facts of *James*. There, we found waiver "not just because of" counsel's stated "no objection," but because "the attorney had had a chance to review" the evidence in advance, "had objected to its being offered into evidence" under a different rule, and "had even objected to using" different evidence in a similar way later in the trial. *Brito*, 979 F.3d at 189–90. We emphasized that "when a party clearly chooses a particular path, it will be respected and generally not further reviewed. Not only does this approach respect the adversarial system, in which the parties choose their arguments, but it also promotes finality." *James*, 955 F.3d at 345.

2

Here, both *Hoffecker* and *Brito*/*James* point to waiver. Some aspects of expert testimony—such as the qualifications underlying an expert's "scientific, technical, or other specialized knowledge"—are unlikely to change between trials. Fed. R. Evid. 702(a). But many provide an opportunity for "different factual and evidentiary circumstances occasioning a new exercise of the district court's discretion." *Hoffecker*, 530 F.3d at 165 (quoting *Sanders*, 485 F.3d at 657). What "facts or data" has the expert relied on, and has he done so using "reliable principles and methods"? Fed. R. Evid. 702. Is the expert's opinion appropriately scoped, or is it impermissibly suggestive of "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense"? Fed. R. Evid. 704. Are the relied-upon facts and data independently admissible, and if not does "their probative value in helping the jury evaluate the opinion substantially outweigh[] their prejudicial effect"? Fed. R.

7

Evid. 703. The answers to these questions very often depend on exactly what testimony is elicited during examination, and how, which depends in turn on the general course of the trial and rulings on prior objections.

Defendants' challenges to Agent David's proposed testimony before and during the first trial reveals a host of such factual, circumstantial concerns. Defendants drilled down on the range of cell towers, how Agent David proposed to depict those geographic ranges visually, on the shape of cell tower coverage areas, and on the factors that determine which tower a cell phone will connect to. Informed by the first trial, the parties conducted a more focused examination of Agent David—while he testified three times in the first trial, he needed to be called only once at the retrial. Defendants' substantive concerns with Agent David's testimony and slides were thus not unchanging legal matters subject to automatic preservation under *Hoffecker*.

The first trial also informed Defendants' strategic approach to Agent David's testimony at the retrial. Like the defendant in *James*, Defendants were on notice of Agent David's testimony and demonstratives and attacked that evidence in other ways.[1] Still, counsel for each Defendant affirmatively stated "no objection" to Agent David's testifying as an expert and to the contents of his slides at the retrial. These were no offhand remarks as in *Brito*, but strategic choices we will respect. In making those choices, Defendants waived this issue for appeal, foreclosing our review.

---

[1] Manley and Phillips moved to suppress the CSLI evidence on Fourth Amendment grounds in both the first and second trials.

## B

Defendants raise a *Batson* violation because of the government's peremptory strike of a prospective black female juror who disclosed her membership in the National Association for the Advancement of Colored People ("NAACP") during voir dire.

### 1

Our review of a *Batson* challenge is highly deferential. "Though we will take a fresh look to ensure that the district court did not deviate from the *Batson* analytical framework, deciding whether there was discriminatory intent 'represents a finding of fact of the sort accorded great deference on appeal[.]'" *United States v. Jacobs*, 21 F.4th 106, 115 (3d Cir. 2021) (citations omitted) (quoting *United States v. Savage*, 970 F.3d 217, 267 (3d Cir. 2020), *cert denied*, 142 S. Ct. 481 (2021)). "This is because finding discriminatory intent 'largely will turn on [an] evaluation of credibility.'" *Id.* (alteration in original) (quoting *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019)). "[T]hese determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we . . . defer to the trial court." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citations omitted) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion)). Thus, "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Flowers*, 588 U.S. at 303 (quoting *Snyder*, 552 U.S. at 477).

A ruling is clearly erroneous where it "leaves us 'with the definite and firm conviction' that the District Court's key findings are mistaken." *Easley v. Cromartie*, 532 U.S. 234, 243 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364,

9

395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). "Each removal of an individual juror because of his or her race is a constitutional violation." *Flowers*, 588 U.S. at 299.

> *Batson* imposes a three-step framework to address purported violations.
>
> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Savage*, 970 F.3d at 266 (quoting *Snyder,* 552 U.S. at 476–77).

2

Defendants challenge the prosecution's use of a peremptory strike against Juror 50, a black woman. The government's proffered race-neutral reasons for the strike were Juror 50's confidence in responding to questions and her membership in the NAACP— not generally, but specifically in light of that organization's political and legal positions opposing mandatory minimum sentences.

The bar for the prosecution at *Batson* step two is low; the prosecution must merely present a purportedly race-neutral explanation for a strike. "Unless a discriminatory intent is inherent in the prosecution's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360). A prosecutor's stated reasons for

10

striking a juror need not be "persuasive, or even plausible"; "the issue is the facial validity of the prosecutor's explanation." *Id.* (first quoting *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam); then quoting *Hernandez*, 500 U.S. at 360).

*Batson*'s third step requires the district court to assess whether the prosecutor's given reasons are pretextual. "The ultimate inquiry is whether the government was 'motivated in substantial part by discriminatory intent.'" *Id.* at 267 (cleaned up) (quoting *Flowers*, 588 U.S. at 303). As noted above, we afford that assessment great deference on appeal. *See Snyder*, 552 U.S. at 477; *Savage*, 970 F.3d at 267.

Defendants argue that the government's strike of Juror 50 violated a per se rule: "Just as it is a violation of *Batson* to strike a juror because she is Black, so too it is a violation to strike a juror merely because of her membership in a predominantly Black organization." Manley Opening Br. 30. But that is not the law. A peremptory strike applied to a juror based on that juror's organizational affiliation, as distinguished from her race, can be race-neutral even if the juror's race in some sense "aligns" with the affiliation.

In *United States v. Payne*, the Sixth Circuit upheld a district court's finding that the prosecutor's explanation for striking black prospective jurors associated with the NAACP and Black Caucus was not racially pretextual because irrespective of race, the jurors belonged to "advocacy groups." 962 F.2d 1228, 1233 (6th Cir.), *cert. denied*, 506 U.S. 1033 (1992).

In *Guidry v. Lumpkin*, the trial court held that membership in the NAACP *could* be "so intertwined with race to render it inherently discriminatory," but found that in the

11

context of the other explanations for the strike, this reason did not establish that the prosecutor was "motivated in substantial part by discriminatory intent." 2 F.4th 472, 485–86 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1212 (2022). The Fifth Circuit affirmed, emphasizing the extent of discretion afforded to a district court for *Batson* findings. *Id.*

In *United States v. Hinton*, the prosecution struck a potential black juror because he wore a "Malcolm X" hat. The government argued the strike was race-neutral based on Malcom X's "perceived militant anti-government" philosophy rather than on the juror's race. 94 F.3d 396, 397 (7th Cir. 1996). The Seventh Circuit noted that the challenge was "to a presumed extreme position, something that might interfere with one's ability to be open and unbiased"; "nothing in the prosecutor's explanation . . . indicate[d] he was doing anything but challenging jurors who might be predisposed not to convict if the evidence warranted such an outcome." *Id.* The panel held that the district court did not clearly err in finding that proffered rationale to be race neutral. *Id.*

Here, Judge Arleo required the government to provide race-neutral reasons for the strike of Juror 50, and to expand on those reasons. Suppl. App. 1349–50. She declared that she was "satisfied the Government has overcome any claim of race-based challenge," but did not make explicit findings about Juror 50. Suppl. App. 1355–56. Two days later, Judge Arleo sua sponte convened proceedings and revisited the strike of Juror 50, noting that she had "spent all night and all day rereading all the cases" and the parties' written briefs. Suppl. App. 1684. She gave both sides an opportunity to reargue the issue. *See* Suppl. App. 1673–86. She also read relevant caselaw into the record to ensure compliance with the requirements of the *Batson* framework. *See* Suppl. App. 1685–88.

12

Finally, she issued a lengthy summation of her finding that the strike of Juror 50 was not pretextual in light of the NAACP's policy advocacy and Juror 50's personal confidence in responding to questions. Suppl. App. 1687–90.

Judge Arleo's conscientious approach in considering the facts and the arguments before her was not clearly erroneous.[2] We will defer to her reasoned judgment and careful findings of fact and affirm her decision denying Defendants' *Batson* challenge to the strike of Juror 50.

## C

Hamlet argues that "[t]he District Court erred in not allowing [him] to review the Jencks [m]aterial from cooperating witnesses and prepare for trial." Hamlet Opening Br. 34.[3] He also argues that the Court erred by "allowing character evidence regarding [his] ownership of jewelry, tax returns, and a collateral act." *Id.* at 36.

---

[2] Manley argues that we should overturn Judge Arleo's finding that the government's strike of Juror 50 was not pretextual because Juror 50 denied any involvement with NAACP's advocacy activities. But the race-neutrality of a strike based on affiliation does not necessarily depend on a member's level of participation. In any event a prosecutor need not take a juror's representations at face value. *See Foster v. Chatman*, 578 U.S. 488, 509–10 (2016); *Rice v. Collins*, 546 U.S. 333, 341 (2006).

Manley also argues that Judge Arleo gave improper weight to the prosecution's "strike rate," i.e., how many of its strikes were used on black jurors. But Judge Arleo recognized the potential salience of strike rates, reading directly from our decision in *Coombs v. Diguglielmo*, 616 F.3d 255 (3d Cir. 2010). And in her extended summation, Judge Arleo emphasized the "evenly split jury" and that "this wasn't four days where the Government systematically struck the one or two African-Americans on the jury." Suppl. App. 1687. Even if we would have weighed the strike rate differently at *Batson* step three, Judge Arleo's understanding of the facts was permissible, and thus not clearly erroneous.

[3] The Jencks Act requires a district court, on a defendant's motion, to order the prosecution to produce witness statements after that witness has been called and has testified. 18 U.S.C. § 3500(b). This affords a defendant a fair opportunity to review

13

"We review for plain error any [non-waived] objections that were not specifically raised before the District Court," *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010), including an unpreserved Jencks Act claim, *United States v. Richards*, 241 F.3d 335, 342 (3d Cir. 2001). To constitute "plain" error, an error must be "clear under current law," "involve substantial rights[,] and prejudice the defendant by 'affect[ing] the outcome of the district court proceedings.'" *United States v. Jackson*, 849 F.3d 540, 544–45 (3d Cir. 2017) (quoting *Olano*, 507 U.S. at 734). We will not exercise our discretion to correct a forfeited error unless it "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings." *Id.* (quoting *Olano*, 507 U.S. at 732).

2

Hamlet waived his Jencks Act claim. Leading up to the retrial, Defendants did request production "of new Jencks material by May 9, 2018." ECF No. 668 (emphasis omitted). But in a pretrial hearing to discuss outstanding motions, Hamlet's counsel acknowledged that the government would be calling no witnesses that had not testified in the first trial, and in fact would only be calling a subset of the first trial witnesses. Hamlet's counsel stated that he "kn[e]w who the cooperating witnesses are now" and that he "ha[d] their testimony," including "12,000 pages of [first] trial transcripts." Suppl. App. 606–07. The government confirmed that "there's not going to be any witnesses for

---

witness statements for impeachment purposes. *See United States v. Maury*, 695 F.3d 227, 247–48 (3d Cir. 2012).

whom you do not already have Jencks."[4] Suppl. App. 609. While wrapping up the hearing, Phillips' counsel reiterated that "there is no additional Jencks." Suppl. App. 653. Neither Hamlet nor any other Defendant identified or pursued any further Jencks material. We thus conclude that Hamlet waived this issue for appeal.

3

Hamlet's character evidence challenges are either waived or not plain error. The government attempted to question Hamlet about his tax returns, but Hamlet's objection was sustained, so the jury never heard the evidence. After Hamlet objected and moved to strike a question about a prior gun violence incident, Judge Arleo sustained the objection, told the prosecutor to move on to another subject, and announced that she would "reserve" on whether to strike the testimony and direct the jury to disregard that portion of the cross-examination. Suppl. App. 2755. When cross-examination ended, Hamlet did not renew the objection—the Court asked "if we have any issues" to address, and Hamlet's counsel responded, "[w]e're good, Judge." Suppl. App. 2787–88.

The government did question Hamlet about a picture he posted on social media a few months after being released from prison that showed him wearing a diamond-studded bracelet and Rolex. Suppl. App. 2743–45. Hamlet did not object to the line of questioning, but now argues that it amounted to plain error under Federal Rule of Evidence 404(b).

---

[4] For efficiency's sake, Hamlet's counsel asked if the government would specifically identify the witnesses who would be testifying at the retrial, which the government agreed to do.

Rule 404 governs the admissibility of character evidence and forecloses propensity inferences by barring admission of "evidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

Rule 404(b) does not bar evidence that "'directly proves' the charged offense"; it applies "only to evidence of '*other* crimes, wrongs, or acts.'" *United States v. Green*, 617 F.3d 233, 248–49 (3d Cir. 2010). We have previously held that "sudden unexplained acquisition of wealth at or about the time of the offense charged" can be circumstantial evidence of criminal activity. *United States v. Kenny*, 462 F.2d 1205, 1219 (3d Cir. 1972). But we have applied that doctrine sparingly, generally requiring a "satisfactor[y] connect[ion] by other circumstances" between the wealth, the defendant, and the alleged offense. *United States v. Zarintash*, 736 F.2d 66, 72 (3d Cir. 1984); *cf. United States v. Chandler*, 326 F.3d 210, 215 (3d Cir. 2003) (introduction of tax history in narcotics cases may be admissible "when it reasonably supports the government's assertion that the defendant possessed substantial cash not obtained through legitimate means").

Hamlet argues that the mere temporal overlap between the alleged racketeering conduct and the photographs was not enough to connect the two. The government made no attempt to logically connect the depicted wealth to the alleged offenses; it did not even ask when Hamlet first acquired the items. Hamlet argues that highlighting his possession of a Rolex and an expensive bracelet several months after being released from prison smacks of the kind of "bad character" evidence that Rule 404(b) prohibits—an impermissible attempt to get the jury to "believe that the accused had in his possession

16

more money than a man in his position could have obtained by honest methods, and therefore must be guilty." *Zarintash*, 736 F.2d at 72 (quoting *Williams v. United States*, 168 U.S. 382, 391 (1897)).[5]

Whether the admission of this evidence was error is a close question, but it is one we need not decide. That is because the admission of inadmissible evidence does not end the inquiry. That error, if it occurred, must have also prejudiced Hamlet, and here we find no "reasonable possibility that the admission into evidence of the [photographs] had a substantial influence on the jury's decision that [Hamlet] was guilty." *Id.* Examination on the topic covered just over two pages of a lengthy trial transcript. The photographs were a negligible portion of the prosecution's case against Hamlet, which was supported by witness testimony, ballistics and CSLI evidence, and surveillance footage. The District Court did not commit plain error, and we will not reverse its judgment.

D

While they did not object or request a curative instruction at the time, Phillips and Manley argue that the government misrepresented the CSLI evidence and testimony during its closing summation, violating their due process rights.

---

[5] Judge Arleo declared other photographs of Hamlet posing in front of expensive vehicles or on beaches inadmissible for this very reason. Apparently, she was inclined to exclude the bracelet and Rolex pictures as well, at least until the government's last-minute production of a certificate showing that the Rolex was purchased in March 2015 (though not showing that Hamlet himself made the purchase). But even that small piece of potentially connective context was not included in the government's brief cross-examination on the topic.

The parties agree that Agent David testified that CSLI evidence can establish only the general location of a phone within a cell tower coverage sector. In its summation, the government stated that Agent David's CSLI evidence "show[ed] that" Batts, Phillips, and Manley were together before the shooting of Anderson, at the scene of the shooting, and then at a hospital. J.A. 3266–67. The government argues that this statement at worst ascribed too high a degree of precision to the CSLI evidence and was therefore highly unlikely to have "altered the outcome of the trial." Resp. Br. 74 (quoting *United States v. Fulton*, 837 F.3d 281, 311 (3d Cir. 2016)). Phillips and Manley argue that it grossly overstated the evidence placing them at those locations and was thus improper and prejudicial, warranting vacatur and remand for a new trial. We disagree.

1

We review an unpreserved challenge to the fairness of a trial based on an alleged misstatement by the prosecution during closing arguments for plain error. *Fulton*, 837 F.3d at 302. Recall that to be "plain," an error must be "clear under current law," "involve substantial rights[,] and prejudice the defendant by affecting the outcome of the district court proceedings." *Jackson*, 849 F.3d at 544–45 (quoting *Olano*, 507 U.S. at 734). For claims of prosecutorial misconduct, plain error exists only if our review "reveal[s] egregious error or a manifest miscarriage of justice." *Fulton*, 837 F.3d at 307 (quoting *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003)).

In making a closing statement or summation, a prosecutor may "'argue reasonable inferences from the evidence,' but may not 'misstate evidence.'" *Id.* at 306 (quoting *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001)). In assessing the prejudicial

18

effect of an alleged misstatement "we must consider 'the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction.'" *Id.* at 311–12 (quoting *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc)).

2

The government likens this case to *Fulton*, in which the defendant-appellant argued that the prosecution's summation exaggerated the precision of GPS evidence introduced through expert testimony. There, the prosecution stated in summation that the expert testified that GPS data from a tracking device inside a stack of stolen bills was "in" the defendant's bedroom for ninety seconds. *Id.* at 310–11. In fact, the expert had testified that GPS data could not convey height, such that the device could have been over or under the bedroom, and that the GPS signal was in (or on top of, or below) the bedroom for sixty seconds and moving about the rest of the house for thirty seconds. *Id.*

We held that the prosecution's summation statement "was a reasonable inference drawn from [the expert's] testimony" and that even a perfectly precise summation would have inculpated the defendant. *Id.* at 311. We noted that litigants "are not required to affirmatively point out limitations in the scope of their evidence," but that the defendant was free to do so in his own closing argument. *Id.* We concluded that "no legal error occurred," but that if it had, it would not "rise to the level required for us to find plain error." *Id.* at 312.

19

Phillips and Manley argue that this case is more like *United States v. Mastrangelo*, 172 F.3d 288 (3d Cir. 1999). There, the prosecution repeatedly overstated the substance of a stipulation regarding the defendant's knowledge of drug production. *Id.* at 295–97. The district court compounded that error by repeating the misstatement in an attempted curative instruction. *Id.* The other evidence for guilt was not overwhelming. *Id.* at 298. In that "pivotal context, the misstatements dramatically enhanced [the defendant's] alleged role in the conspiracy without supporting evidence." *Id.* On clear error review, we reversed and remanded for a new trial. *Id.*

This case is more like *Fulton* than *Mastrangelo*. Even if not precise, the prosecution's summation involved reasonable inferences from the evidence. *Fulton*, 837 F.3d at 306.[6] And unlike the defendant in *Fulton*, counsel for Manley and Phillips used their opportunity in closing to emphasize the limitations of CSLI and Agent David's testimony. *See* J.A. 3419 ("[T]here's no way to know what distance from the cell tower the cell phone actually is."); J.A. 3422 (two "people who were in" the same "pie wedge [an area covered by a cell tower] . . . could be at opposite ends of" the wedge; Agent David did not "know where exactly within the pie wedge" a phone was located, "or even

---

[6] Phillips also suggests that portions of Agent David's testimony directly contradicted the prosecution's statement, rendering it flatly inaccurate. Specifically, he points to Agent David's answer on cross-examination that Manley's phone connected to a cell tower with a depicted range that did not include the hospital at 4:57 a.m., precisely the time when other evidence placed Phillips and Manley there. But just before that testimony Agent David explained that his slides did not (and could not) depict firm, definite coverage areas for each cell tower, and that a phone at the hospital "certainly could be within the reasonable coverage area of that tower." J.A. 3152–54. The prosecution's summation thus did not contradict the evidence.

how far the wedge goes."); J.A. 3510; J.A. 3539 (Phillips arguing that a ping from Manley's phone to a tower aligned with the car from which Anderson was shot is not dispositive, since phones do not necessarily ping the closest tower).

This case also more closely resembles *Fulton* when we consider "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction." *Fulton*, 837 F.3d at 311–12 (quoting *Zehrbach*, 47 F.3d at 1265). The CSLI evidence here was buttressed by eyewitness testimony from three cooperating Crip-affiliated witnesses, ballistics evidence, and surveillance footage. Unlike in *Mastrangelo*, Judge Arleo found that the evidence supporting a guilty verdict was "overwhelming" for all three defendants. Resp. Br. 20 (quoting ECF Nos. 823, 824 and 825). And though no curative instruction was requested or given, the jury was instructed that lawyer's statements like the prosecution's summation are not evidence. *See* J.A. 3217, 3358.

We find no prosecutorial-misconduct error in the government's characterization of CSLI evidence in its summation. If any error did occur, it fell far short of an "egregious error or a manifest miscarriage of justice." *Fulton*, 837 F.3d at 307 (quoting *Brennan*, 326 F.3d at 182).

\*     \*     \*

For the reasons stated above, we will affirm the District Court's judgments of conviction for Hamlet, Phillips, and Manley.

21